**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                              :
HANY EL SAYED,                :
                              :    Civil Action No.
            Petitioner,       :    11-7324 (DRD)
                              :
       v.                     :    **O P I N I O N**
                              :
ERIC H. HOLDER, JR., et al.,  :
                              :
            Respondents.      :
_____:

**Dickinson R. Debevoise**, District Judge:

On December 12, 2011, Hany El Sayed ("Petitioner"),[1] a native of Egypt, executed the instant petition ("Petition"), pursuant to 28 U.S.C. § 2241, challenging his detention by the Department of Homeland Security ("DHS")[2] at Essex County Jail.  For the reasons set forth below, the Court will dismiss the Petition without prejudice, will direct Petitioner to: (a) file an amended pleading; and (b) submit a valid in forma pauperis application.

---

[1] The Clerk erred in stating Petitioner's registration number on the docket sheet.  Petitioner's correct alien number is "094244679," and his full name is "Hany Mahmoud Hassan El Sayed." See <<https://locator.ice.gov/odls/searchByAlienNumber.do>>.  The Court will direct the Clerk to correct the docket sheet accordingly.

[2] Petitioner's submission makes frequent references to "ICE."  See Docket Entry No. 1.  "ICE" means U.S. Immigration and Customs Enforcement, which is "the principal investigative arm of the [DHS]." <<http://www.ice.gov/about/overview/>>.

Page -1-

The Petition is a rather lengthy submission. See, generally, Docket Entry No. 1. However, and unfortunately enough, the Petition offers this Court mainly Petitioner's perceptions of what the legal regime is (or should be), see id., while the factual information pertaining to Petitioner's own circumstances is very scarce.[3] Indeed, the only facts this Court could gather from carefully examining the Petition are that: (a) the entire span of Petitioner's detention in custody of the ICE, that is, before, during and after his immigration proceedings, has lasted for about twenty-three months, see id. at 1 (so stating); (b) Petitioner is a native and citizen of Egypt, see id. at 2 (so stating); (c) Petitioner is a holder of permanent legal residency card in the United States, see id. at 7 and 11 (so suggesting); (d) Petitioner might have had a criminal conviction (or a number of criminal convictions) in the United States, see id. at 6 (so suggesting); (e) Petitioner's immigration proceedings have produced a final order of removal, see id. at 4 and 6 (so stating); however (f) Petitioner either hopes to challenge or might be in the process of challenging his final order of removal. See id. at 7 and 9 (so suggesting).

---

[3] "Habeas corpus petitions must meet heightened pleading requirements." McFarland v. Scott, 512 U.S. 849, 856 (1994). A petition must "specify all the grounds for relief" and set forth "*facts* supporting each of the grounds thus specified." 28 U.S.C. § 2254 Rule 2(c) (amended Dec. 1, 2004, applicable to § 2241 petitions through Habeas Rule 1(b)) (emphasis supplied).

In contrast, Petitioner's discussion of what law is (or should be) is rather extensive. See, generally, Docket Entry No. 1. Toward that endeavor, Petitioner cites a number of decisions rendered by the United States Supreme Court, the United States Court of Appeals for the Third Circuit ("Court of Appeals") and other circuit and district courts. See, generally, id. (citing, inter alia, Demore v. Hyung Joon Kim, 538 U.S. 510 (2003); Zadvydas v. Davis, 533 U.S. 678 (2001); Plyler v. Doe, 457 U.S. 202 (1982); Mathews v. Eldridge, 424 U.S. 319 (1976); Diop v. ICE/Homeland Sec., 656 F.3d 221 (3d Cir. 2011); Diouf v. Napolitano, 634 F.3d 1081 (9th Cir. 2011); Gonzalez v. O'Connell, 355 F.3d 1010 (7th Cir. 2004); Patel v. Zemski, 275 F.3d 299 (3d Cir. Pa. 2001); Chi Thon Ngo v. INS, 192 F.3d 390 (3d Cir. 1999); Tijani v. Willis, 430 F.3d 1241 (9th Cir. 2005); Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942 (9th Cir. 2008); Krolak v. Achim, Civil Action No. 04-6071 (N.D. Ill.)). There are a few minor problems with the case law cited, seemingly in a wholesale manner, by Petitioner[4] and, in addition, there is one critical shortcoming. That critical shortcoming ensues from the difference between the legal analyses applicable to habeas challenges raised by "pre-removal-period" aliens and habeas challenges raised by "removal-period" aliens.

---

[4] These minor problems include Petitioner's incorrect cites of some cases, such as Diouf, misstatements of the current value of other cases, such as Patel, reliance on those cases which holdings were offered to the Court of Appeals' attention and rejected by the Diop Panel, such as Tijani and Casas-Castrillon.

The aforesaid key distinction cannot be duly appreciated without a clarification of what the meaning of the term "removal period" is, since this term is a legal term of art ensuing from the relevant statutory language. Specifically, Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States. Detention during that "removal" period is mandatory[5] and, in addition, § 1231(a) provides that this "removal period" shall be extended, and the alien may remain in detention during such extended period, if the alien "acts to prevent the alien's removal [ensuing from his/her] order of removal."  8 U.S.C. § 1231(a)(1)(C).

This "removal period" starts on the latest of the following: (a) the date when the order of removal becomes administratively final (that is, appeal to the Board of Immigration Appeals ("BIA") was either taken and ruled upon, or the time to appeal expired); or (b) if the removal order is judicially reviewed *and*, *in addition*, if a circuit court orders a stay of the removal, then it is the date of the court's final order as to that removal, or (c) if the alien is detained or confined (except under an immigration process), then it is the date when the alien is released from

---

[5] Section 1231(a)(2) mandates detention during the removal period. See 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 212(a)(2) or 212(a)(3)(B)").

confinement.  See 8 U.S.C. § 1231(a)(1)(B).

Importantly, if – during the period of removal triggered by the then-latest of the three above-listed events applicable to a particular alien – the alien is subjected to a qualifying superceding event, such superceding event starts the alien's aforesaid "removal period" anew, as many times as such superceeding events occur.  See 8 U.S.C. § 1231(a)(1)(B).  As the court explained:

> [There cannot] be ["]only one["] removal period[:] . . . that is the only rational reading of the statute. . . . [T]he statute provides that the removal period begins on the latest of several dates. The passing of one date does not stop the operation of the statute. In a sense, the only way to apply the statute to a given situation is retrospectively. That is, the removal period begins when the removal order becomes final. If a court issues a stay [or a new detention unrelated to removal proceedings takes place], the removal period begins [anew] when the stay is lifted [or when such new detention ends]. Therefore, the only way to determine when the removal period begins, or began, is to look at what events already have occurred. If there is another potential event, there is another potential beginning date for the removal period. The only sensible reading of this provision is that [DHS/ICE] is required to effectuate the removal within 90 days of certain events, but will have another 90 days if another one of the designated events occurs at a later date. The obvious reason for this is that [DHS/ICE] 's authority to effect the removal is suspended due to the occurrence of the later event (such as a stay order [or a new detention on criminal charges]).

Michel v. INS, 119 F. Supp. 2d 485, 498 (M.D. Pa. 2000); accord Morena v. Gonzales, 2005 U.S. Dist. LEXIS 37989, at *18 (M.D. Pa. Oct. 4, 2005); Atkinson v. INS, 2002 U.S. Dist. LEXIS 11335, at *5 (E.D. Pa. June 25, 2002); Marcelus v. INS, 2002 U.S. Dist. LEXIS

795, at *6 (E.D. Pa. Jan. 16, 2002); Dunbar v. Holmes, 2000 U.S. Dist. LEXIS 17048, at *6-7 (E.D. Pa. Nov. 28, 2000).

Moreover, even after the 90-day "removal period," the government may further detain the alien, under 8 U.S.C. § 1231(a)(6), for a "certain" period of time. Specifically, recognizing that some countries might never agree – or be able – to accept their citizens awaiting to be removed there from the United States and, thus, these detainees might end up being detained "indefinitely" (i.e., effectively spending the remainder of their lives in confinement awaiting their never-materializing removal), the Supreme Court held that aliens may be detained under § 1231(a)(6) for "a period reasonably necessary to bring about that alien's removal from the United States." Zadvydas v. Davis, 533 U.S. at 689. Being mindful that its holding would lead to difficult judgment calls in the courts, the Supreme Court, "for the sake of uniform administration in the federal courts," recognized a six-month "*presumptively* reasonable period of detention." Id. at 700-01 (emphasis supplied). Yet, after establishing this presumptively reasonable period of detention, the Supreme Court stressed, in unambiguous terms, that even

> [a]fter this 6-month period, o[nly if] the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.

> *This 6-month presumption, of course, does not mean that every alien not removed must be released after six months*. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

Id. at 701 (emphasis supplied).

In addition, since no language in Zadvydas excluded or limited the operation of the tolling-like function enunciated in 8 U.S.C. § 1231(a)(1)(C), an alien who, during his presumptive Zadvydas-based period, takes actions delaying his removal (e.g., by refusing to cooperate with the ICE in his/her removal to his/her country of origin), cannot demand his/her release upon expiration of these six months. See, e.g., Wang v. Carbone, No. 05-2386, 2005 U.S. Dist. LEXIS 24499 (D.N.J. Oct. 17, 2005) (calculating the presumptive period excluding the period of non-cooperation and relying on Riley v. Greene, 149 F. Supp. 2d 1256, 1262 (D. Colo. 2001), and Sango-Dema v. District Director, 122 F. Supp. 2d 213, 221 (D. Mass. 2000)). Rather, the period affected by the alien's obstructive actions is excluded from the presumptive period articulated in Zadvydas, thus causing a quasi-tolling mimicking, in its operation, the tolling articulated in § 1231(a)(1)(C).[6]

---

[6] Indeed, it would be anomalous to suggest that an alien's frustration of the government's efforts to remove him/her would reward the alien with release from custody if the alien is persistent enough to keep his/her thwarting activities for a period exceeding Zadvydas-based six months. "Zadvydas does not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood

Consequently, in the event Petitioner is an alien held in ICE custody during his "removal period," Petitioner might have a viable claim if, and only if: (a) he asserts facts showing that his order of removal became final (i.e., that the BIA affirmed his order of removal or his time to appeal to the BIA expired) more than six months ago; (b) he asserts facts showing no significant likelihood of Petitioner's removal to Egypt in the reasonably foreseeable future, regardless of Petitioner's record of his good-faith cooperation with the ICE in the ICE's efforts to have him removed to Egypt;[7] and (c) requests outright release from confinement.

---

of removal in the reasonably foreseeable future if the detainee controls the clock." Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir. 2003).

[7] The Court is mindful that Egypt is among the countries affected by so-called "Arab Spring" movement, which could be loosely defined as a wave of social unrests, demonstrations, protests and revolutions that have been taking place in some Arabic-speaking countries since December 2010. Egyptian revolution followed a campaign of non-violent civil resistance in the beginning of 2011. See, e.g., The First Anniversary for the Egyptian Revolution, EcPulse (Jan. 25, 2012); see also Egypt on Road to Democracy, Says Us Official, UMCI News (Jan. 28, 2012) (On November 28, 2011, Egypt held its first post-revolution parliamentary election). Since at least some removal orders of Egyptian citizens from the United States were successfully executed after the revolution, it does not appear that Egypt is refusing acceptance of its citizens and cooperated with the ICE efforts. See, e.g., Mohamed v. Holder, 439 F. App'x 577 (9th Cir. 2011) (finding no basis for the litigant's assertion that, as of June 15, 2011, the litigant's immigration judge erred in denying the litigant's application for asylum); see also <<http://www.ice.gov/news/releases/1108/110801cairo.htm>> and <<http://www.ice.gov/news/releases/1107/110714newyork.htm>> (indicating that the Egyptian authorities and the ICE maintain close working relationship and jointly counter antiquities trafficking). Therefore, the fact that Egypt is one

Notably, the period Petitioner spent in ICE custody prior to having his order of removal finalized is of no relevance to this above-detailed "removal period"-based analysis.

In contrast, an alien held in the ICE custody during the time which *cannot* qualify as the alien's "removal period" has no basis to raise Zadvydas challenges (and, correspondingly, no basis to seek outright release); rather, that alien could raise habeas claims seeking a qualitatively different habeas relief, i.e., a remedy in the form of a bond hearing, which could be ordered in the event the alien has been held for a prolonged period of time under § 1226(c) (that is, the statute, which does not expressly provide for a bond hearing). Although the Supreme Court, in Demore v. Kim, held that Section 1226(c) "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process," see 538 U.S. at 523, the Court of Appeals recently finessed the holding of Demore by ruling that

> § 1226(c)[] . . . implicitly authorizes detention for [only] a reasonable amount of time, after which the authorities must make an individualized inquiry into

---

of the "Arab Spring" states does not, in and by itself, suggest that Petitioner could not be removed to his country of origin in the foreseeable future.  However, this Court cannot rule out the possibility that Petitioner might assert facts (reflecting on his personal circumstances) showing that there is no likelihood of his removal to Egypt within foreseeable future regardless of Petitioner's past and present active cooperation with the ICE in the ICE's efforts to remove him.  Therefore, in the event Petitioner elects to raise Zadvydas challenges in his amended petition, he should focus on the *specific facts so indicating*.

>    whether detention is still necessary to fulfill the
>    statute's purposes of ensuring that an alien attends
>    removal proceedings and that his release will not pose a
>    danger to the community.

Diop, 656 F.3d at 231.

Thus, a § 1226(c) alien detainee who is in custody during such stage of his/her immigration proceedings that cannot qualify as that alien's "removal period" might be entitled to habeas relief (in the form of an order directing a bond hearing) under Diop.

Here, the Petition at bar offers this Court conflicting factual assertions. On one hand, Petitioner makes references to the entirety of his period of confinement in the ICE custody and states that he is seeking a bond hearing, see Docket Entry No. 1, at 1 and 10-11; this line of statements strongly suggests that Petitioner is a pre-removal-period alien detainee seeking a Diop-based form of habeas relief. On the other hand, Petitioner simultaneously states that he is an alien detainee subject to a final order of removal (and no statement in the Petition indicates that the Court of Appeals issued stay of his order of removal); this line of statements strongly suggests interested in a Zadvydas-based form of habeas relief. However, Petitioner cannot be both.[8]

---

[8] In an attempt to supplement Petitioner's scarce and conflicting factual assertions by means of this Court's own research, the Court examined the dockets of the Court of Appeals and located two matter seemingly commenced by Petitioner. The first of these two matters, Hany Mahmoud Hassan El Sayed v. Att'y Gen. USA, U.S.C.A. Index No. 10-4323 (3d Cir.), was commenced on December 11, 2010, and dismissed for lack of jurisdiction on December 22, 2010, on the grounds of Petitioner's failure to

Being not presented with facts enabling the Court to conduct a meaningful screening of the Petition,[9] this Court cannot expect Respondents to intelligently answer Petitioner's challenges which this Court itself cannot comprehend with a sufficient degree of

---

exhaust administrative remedies (specifically, in light of the fact that, at the time of the Court of Appeal's ruling in that matter, Petitioner's administrative appeal as to his order of removal was still pending before the BIA).  The second matter, Hany Mahmoud Hassan El Sayed v. Att'y Gen. USA, U.S.C.A. Index No. 11-1056 (3d Cir.), was commenced on January 10, 2011, and its procedural history included the Court of Appeals' order *denying* Petitioner's motion to stay his removal, see id., docket entry dated January 24, 2011 (clarifying that Petitioner "failed to demonstrate a likelihood of success on the merits of his [application to vacate his order of removal]"), the Court of Appeals' order *denying* Petitioner's motion for reconsideration, see id., docket entry dated March 1, 2011, and the Court of Appeals' order dismissing that matter on the grounds of Petitioner's failure to file his brief and appendix.  While this Court cannot rule out the possibility that Petitioner might have another action currently pending before the Court of Appeals (and that Petitioner succeeded at obtaining stay of removal in that action), since it is, indeed, plausible that the system of Public Access to Court Electronic Records might have a case missing, it appears that Petitioner, more likely than not, is a "removal period" detainee who has no basis to seek any Diop-based form of habeas relief.  If so, Petitioner should focus his future habeas efforts, if any, on stating the factual predicate supporting his Zadvydas-based challenges.

[9] Under 28 U.S.C. § 2241(c), habeas jurisdiction "shall not extend to a prisoner unless . . . he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  Thus, a federal court has subject matter jurisdiction under § 2241(c)(3) if two requirements are satisfied: (1) the petitioner is "in custody,"; and (2) the custody could be "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3); see also Maleng v. Cook, 490 U.S. 488, 490 (1989).  Consequently, this Court could have subject matter jurisdiction over Petitioner's pleading only if he asserts facts showing that his detention is not statutorily authorized or violates his constitutional rights.

clarify. Therefore, the Court will dismiss the Petition at bar, but such dismissal will be without prejudice, and the Court will direct Petitioner to file an amended pleading detailing the facts of his challenges in accordance with the guidance provided herein.

Finally, in light of Petitioner's failure to submit a valid in forma pauperis ("IFP") application,[10] the Court will direct Petitioner to duly apply for IFP status in conjunction with Petitioner's submission of his amended pleading, if any.

An appropriate Order accompanies this Opinion.

*S/Dickinson R. Debevoise*
**Dickinson R. Debevoise**,
**United States District Judge**

Dated: February 9, 2012

---

[10] In a habeas matter, the prisoner seeking to proceed IFP must submit to the Clerk: (a) a completed affidavit of poverty; and (b) a certification signed by an authorized officer of the institution certifying both the amount presently on deposit in the petitioner's prison account as well as the greatest amount on deposit in the petitioner's prison account during the six month period prior to the date of the certification. See Local Civil Rule 81.2(b). The prisoner's legal obligation to prepay the filing fee or to duly obtain IFP status is automatically incurred by the very act of initiation of his/her legal action. See Hairston v. Gronolsky, 2009 U.S. App. LEXIS 22770, at *5 (3d Cir. Oct. 15, 2009) (citing Hall v. Stone, 170 F.3d 706, 707 (7th Cir. 1999)). Here, Petitioner submitted a motion, See Docket Entry No. 1-1, the language of which could, loosely, qualify as an affidavit of poverty. However, Petitioner submitted no certification of his prison account. Granted that Petitioner is being ordered to submit his amended pleading, it appears that Petitioner's rights could not be prejudiced by an undue delay if Petitioner is ordered to submit such a proper certification together with his amended petition.